841 So.2d 472 (2002)
Michael R. BARNES, Appellant,
v.
David Paul HORAN, Karen Horan, Edward W. Horan, David Paul Horan, P.A., and Edward W. Horan, P.A., Appellees.
No. 3D01-2472.
District Court of Appeal of Florida, Third District.
November 27, 2002.
Rehearing, Rehearing and Certification Denied March 28, 2003.
*473 Michael R. Barnes (Key West); Richard L. Wilson (Orlando), for appellant.
Horan, Horan & Wallace, and David Horan (Key West), for appellees.
Before GREEN and SHEVIN, JJ., and NESBITT, Senior Judge.
Rehearing, Rehearing En Banc and Certification Denied March 28, 2003.
SHEVIN, Judge.
Michael Barnes appeals an Order Striking Plaintiff's Second Amended Complaint and Dismissing Action with Prejudice. On the following analysis, we reverse.
Two days before the 16th Judicial Circuit State Attorney election, David Horan ran a paid political advertisement, entitled "An Apology to the Citizens of the Florida Keys", published in the Key West Citizen. The letter concerned candidate Barnes, who had been a Horan & Horan employee. The publication was printed on Horan & Horan stationery and signed by attorney David Horan. The following is the text of the letter:
For 30 years I have had the privilege of practicing law in the Keys. I have not, and will not, run for political office. As a former prosecutor, Assistant County Attorney, Special Counsel for the City of Key West, Chairman of the Military Affairs Committee and immediate past President of the Greater Key West Chamber of Commerce, I am acutely aware of how important our political office holders are to our county. It is for this reason I am publishing this apology/explanation.
In late 1990, my firm decided to add an additional associate/attorney, and I was introduced to Michael "Mick" Barnes by a former professor for whom I had a great deal of respect. Mr. Barnes was about to graduate from law school. After his initial office interview, my brother/law partner expressed doubts about Mr. Barnes, and my secretary/wife expressed even stronger concerns, advised me against offering him a position in our firm. I'm apologizing to everybody for not following their advice. For a period of three (3) months "Mick" Barnes was an employee of my firm. Toward the end of his employment, every secretary, book-keeper, partner and associate became convinced that Mr. Barnes' employment had to be terminated. Because of numerous contradictory misrepresentations by Mr. Barnes' to *474 everyone in the firm (including myself), not one person in my firm could, or would, trust him to tell the truth.
Mr. Barnes has stated that he has practiced law for 11 years but he was not sworn into the Florida Bar until October 18, 1991. In his July 2000 Public Disclosure Statement (filed with our Supervisor of Elections), Mr. Barnes was forced to disclose that having practiced law for nearly ten (10) years, he still owes his student loan of nearly $28,000.00. In his Financial Disclosure, Mr. Barnes shows his real estate assets as being $325,000 and then disclosed his liabilities as including $162,838 to Fleet Mortgage and $129,324 to Stillwater National Bank. While one could assume these are mortgages on his real estate, such is not the case.
The disclosure of $129,324 liability to the Stillwater National Bank-made by "Mick" Barnes, under oath on July 17th, 2000 was false and Mr. Barnes knew it. The Stillwater Bank obtained a personal judgment against Mr. Barnes on January 5th, 1996 ... "against the Defendant Michael R. Barnes, in the sum of $129,324.21, with interest thereon at the rate of 8.5% per annum from the 5th day of January 1996 until paid; plus attorneys fees in the sum of $15,500.00 and costs accrued and accruing." This language is directly from the District Court Order.
Only July 17th, 2000, when Mr: Barnes swore his liability to Stillwater National Bank was $129,324.21, he left out $50,382.23 in accrued interest and the $15,500.00 in attorney fees. Mr. Barnes' true liability on this one Judgment is over $195,000.00 and he has failed to pay a penny on it for nearly 5 years. His net worth was overstated by 54%.
Mr. Barnes' conduct in Court has earned him somewhat unanimous disdain and contempt from most of the Monroe County attorneys and nearly all of our Judges. The Code of Judicial Conduct prohibits Judges from publishing their opinions regarding "Mick" Barnes, but attorneys are under no such prohibition. Mr. Barnes is, not a viable candidate for our State Attorney. For 30 years I have built credibility within this community, with my clients and our courts. Since I have a longer personal and professional relationship with Michael "Mick" `Barnes than any other Monroe County citizen, I am asking that you give my informed opinion credibility for purposes of your upcoming decision and vote.
The Florida Keys deserve better than "Mick" Barnes. The taxpayers should not have to pay his student loan or his judgement.
(emphasis in original).
Barnes lost the election. He thereafter filed a defamation and conspiracy action against David Horan, Karen and Edward Horan, individually, as well as David and Edward's P.A., and Horan & Horan, a partnership. Barnes' first amended complaint was based on four claimed false statements appearing in the ad:
a) Toward the end of his employment, every secretary, bookkeeper, partner and associate became convinced that Mr. Barnes' employment had to be terminated. Because of numerous contradictory misrepresentations by Mr. Barnes to everyone in the firm (including myself), not one person in my firm could, or would trust him to tell the truth;
b) Mr. Barnes was forced to disclose that having practiced law for nearly ten (10) years he still owes his student loan of nearly $28,000.00;

*475 c) The disclosure of $129,324 liability to the Stillwater National Bank, made by "Mick" Barnes, under oath on July 17, 2000 was false and Mr. Barnes knew it; and
d) Mr. Barnes' conduct in court has earned him somewhat unanimous disdain and contempt from most of the Monroe County Attorneys and nearly all of our judges.
Barnes' complaint also alleged that Edward Horan sent a defamatory email to another attorney, which evidenced Edward's complicity in the publication of the letter.
The defendants filed motions to dismiss. The court entered an omnibus order granting the business entities motion; denying David, Karen, and Edward's motion as to the conspiracy count; ruling that statements (a) and (d) of the first amended complaint were not actionable as defamatory; and permitting discovery. The court denied Barnes' motion for rehearing. The court entered an order on amended motion granting Barnes ten days to file a second amended complaint against the business entities.
Barnes filed a second amended complaint.[1] However, despite the findings in the trial court's omnibus order, Barnes used the second amended complaint to reassert claims (a) and (d), the two claims that the court had previously rejected as a basis for recovery, and dropped claims (b) and (c), the two claims on which the trial court had concluded that the case could proceed. The defendants filed a motion to strike the pleadings. A hearing on the motion was held on July 26, 2001.
At the hearing, David Horan maintained that the trial court should strike the complaint and dismiss for noncompliance with the omnibus order. Barnes told the court that if it dismissed with prejudice, he could appeal the points raised in the second amended complaint, including the points the trial court had initially rejected. David Horan maintained that the time for appeal of the rejected points was when the court had ruled that the defamation action could not rest on those points and when Barnes's motion for rehearing of those rulings had been denied. Thus, according to Horan, the time to seek review of the rejected points had passed. He argued that the court could dismiss the second amended complaint even without finding wilful noncompliance.
A reading of the July 26, 2001, transcript shows that the trial court was confused as to the effect an order dismissing the action would have. The judge was troubled that under David Horan's analysis, he was not sure how Barnes could have gotten appellate review of the court's rulings as to the rejection of the two allegedly defamatory statements, upon which Barnes wanted to proceed. Finally, the trial judge concluded that he was granting the motion to strike, but specifically said he was not making a finding of wilfulness or contempt, observing "[a]nd to the extent the parties will bring the case to the Appellate Court, I will welcome it and God speed."
The order under review specifically provided that the judge had considered the file, the motions and responses, and oral arguments of the parties. Then, in a two sentence adjudication, the court granted *476 the motion to strike and denied further amendment. Additionally, the court dismissed the action with prejudice. Our review of the record leads us to the inescapable conclusion that the trial judge struck the complaint not because he found a violation of a court order that deserved this severest of sanctions,[2] but rather, because with the two claims he had decided had no merit stricken, and the plaintiff having abandoned his other claims, the plaintiff had no other basis to proceed.[3]
Initially, we note that we do not agree with David Horan's claim that the time for review of the two claims at issue has passed. Because all of the claims involved relate to a specific publication, the claims are intertwined and would not have been reviewed had Barnes attempted to appeal those intermediate rulings while the matter proceeded. In dismissing the action, the trial judge's statements reflect that he was doing so because all of the claims had been stricken. The dismissal with prejudice marked the end to litigation and allows our review of the case.
In this posture, the only way we can decide if the trial court erred in striking the second amended complaint is to determine whether the claims as stated can support an action for defamation. Barnes maintains that the statements are of a specific type in that they imply undisclosed facts. In assessing such a claim, we must consider the law as set out in Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990),[4] and reflected in this court's opinion in Stembridge v. Mintz, 652 So.2d 444, 446 (Fla. 3d DCA 1995), wherein we observed:
In Eastern Air Lines, Inc. v. Gellert, 438 So.2d 923 (Fla. 3d DCA 1983), this court followed [Restatement(Second) of Torts] section 566 and summarized the applicable principles:
[S]tatements of pure opinion cannot constitute actionable defamation. However, a statement that although ostensibly in the form of an opinion "implies the allegation of undisclosed defamatory facts as the basis for the opinion," Restatement (Second) of Torts § 566 (1977), is actionable. The difference between the former, unactionable, pure opinion and the latter, sometimes called "mixed opinion," is that:
"Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed *477 to exist by the parties to the communication."

From v. Tallahassee Democrat, Inc., 400 So.2d 52, 57 (Fla. 1st DCA 1981)
....
It is the court's function to determine from the context "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct...." Restatement (Second) of Torts § 566, comment c. If [defendant's] statement would likely be reasonably understood by ordinary persons as a statement of an undisclosed existing defamatory fact, then it was properly the jury's function to determine whether a defamatory meaning was attributed to it by recipients of the communication....
Stembridge, 652 So.2d at 446 (citations omitted).
Barnes maintains that applying this standard to the instant occurrence, he has alleged sufficient facts to proceed on a claim that the statements at issue were defamatory under the Milkovich standard. We agree.
As the trial court agrees that statements (b) and (c) are actionable, we need only address statements (a) and (d).[5] Once again, in statement (a) David Horan asserted that "every secretary, bookkeeper, partner and associate became convinced that Mr. Barnes' employment had to be terminated. Because of numerous contradictory misrepresentations by Mr. Barnes to everyone in the firm (including myself), not one person in my firm could, or would trust him to tell the truth." The content of statement (a) does more than merely state the author's opinion. Rather, it implies to the reader that David Horan, through his relationships with the people in his firm, has acquired knowledge of the fact that the plaintiff's former co-workers thought he was a liar who could not be trusted. The impression that Horan was privy to the views of the people in his firm is further emphasized by the fact that the letter was printed on Horan & Horan stationery. The alleged falsity of this statement can be verified by receiving sworn testimony from the employees and other firm members to whom these beliefs were ascribed.
Similarly, statement (d) gives the impression of an insider's knowledge of undisclosed facts. In statement (d), Horan claims that "Mr. Barnes' conduct in court has earned him somewhat unanimous disdain and contempt from most of the Monroe County Attorneys and nearly all of our judges." Considering that the article also explains that in addition to being Barnes' former employer, Horan was a "former prosecutor, Assistant County Attorney, Special Counsel for the City of Key West, Chairman of the Military Affairs Committee and immediate past President of the Greater Key West Chamber of Commerce," it is likely that an ordinary reader would conclude that David Horan was someone who would have insight into whether the plaintiff had in fact earned the "somewhat unanimous disdain and contempt from most of the Monroe County *478 Attorneys and nearly all of [the] judges." As with statement (a), the falsity of this statement can be verified by receiving sworn testimony from the people to whom the feelings of disdain and contempt have been attributed, namely the attorneys and judges[6] of Monroe County.
The implication that Mr. Horan had knowledge of undisclosed facts is further buttressed by the remarks immediately following statement (d), in which he states:
For 30 years I have built credibility within this community, with my clients and our courts. Since I have a longer personal and professional relationship with Michael "Mick" Barnes than any other Monroe County citizen, I am asking that you give my informed opinion credibility for purposes of your upcoming decision and vote.
(emphasis added). Mr. Horan's self-proclamation that his opinion is informed, placed almost immediately following statement (d), leads to the unavoidable conclusion that his sentiments are based on undisclosed facts.
Therefore, although we voice no opinion on the ultimate merits of Barnes' claim, we do believe that he has alleged a sufficient factual basis to proceed in his prosecution of the matter.
Accordingly, the order under review is reversed, and the matter remanded for the plaintiff to proceed under his second amended complaint.
NESBITT, Senior Judge, concurs.
GREEN, J. (specially concurring).
I agree with the majority that the allegations contained in the second amended complaint, taken as true, state a cause of action for defamation, but I write separately because, unlike the majority, I believe that this case is governed by New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny rather than Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).
The appellant in this case, Mr. Barnes, was a candidate for public office, Monroe County State Attorney, and therefore was a "public figure."[7]See Monitor Patriot Co. v. Roy, 401 U.S. 265, 271, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)(finding that a candidate for public office is characterized as a public official or public figure). The statements complained of in the second amended complaint were regarding plaintiffs "qualifications" to hold public office and therefore were matters of public concern. See e.g., Demby v. English, 667 so.2d 350 (Fla. 1st DCA 1995)(allegedly defamatory letter regarding job performance of public official was matter of public concern). Thus, a brief discussion of the evolution of the law regarding "public figures" or "public *479 officials" and matters of "public concern" is warranted.
In New York Times, the Supreme Court enunciated:
a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'that is with knowledge that it was false or with reckless disregard of whether it was false or not.
376 U.S. at 279-80, 84 S.Ct. 710. This rule was formed out of the Court's concern that a "state law rule compelling the critic of official conduct to guarantee the truth of all his factual assertions would deter protected speech." Gertz v. Robert Welch Inc., 418 U.S. 323, 334, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
Later, in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the high court extended the New York Times test to criticisms of "public figures," as well as "public officials." The Court concluded that for both "public officials" and "public figures," "actual malice" must be shown by a clear and convincing standard of proof. See Gertz, 418 U.S. at 342, 94 S.Ct. 2997; see also Nodar v. Galbreath, 462 So.2d 803, 806 (Fla. 1984) (stating that: "`actual malice,' which must be shown before a public official or public figure may recover for defamation relating to a matter of his official conduct or of public concern, consists of knowledge of falsity or reckless disregard of truth or falsity, and must be shown by clear and convincing evidence.").
In Gertz, the Supreme Court declined to extend the New York Times rule to private persons defamed by media publications or broadcasts or commentaries on matters of public interest. As the court explained:
Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.
* * *
[More important] public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual.
Gertz, 418 U.S. at 344-45, 94 S.Ct. 2997.
Accordingly, the Gertz court held that states may establish their own standards of responsibility of news media defendants to defamed private persons, as long as they neither impose liability without fault or award presumed damages in the absence of actual malice.[8]
Next, in Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the court found that at least where a media defendant is concerned, an actionable statement on matters of public concern must be provable as false by the plaintiff before there can be liability under state defamation law. The Hepps court limited its holding to cases involving media defendants and left open the question of the standard for non-media private defendants raising statements of public concern about public figures.[9] This is precisely the issue presented here. That is, this case raises the question of the applicable *480 standard for an alleged defamed public official by a private defendant on matters of great public concern.
In the absence of any direct precedent from either the United States Supreme Court or Supreme Court of Florida on this issue, I believe that at the very minimum, the standard set forth in the New York Times line of cases, requiring actual malice, must govern. See Milkovich, 497 U.S. at 20 n. 6, 110 S.Ct. 2695 ("[p]rior to Hepps, ... where public official or public figure plaintiffs were involved, the New York Times rule already required a showing of falsity before liability could result." (citations omitted)).
Since actual malice requires more than the mere publication of a falsity, I believe that footnote 6 of the majority's opinion is misplaced. The ultimate issue here is not whether Horan's statements were false, but rather whether Horan knew or "recklessly disregarded" that his statements were false. See Nodar, 462 So.2d at 806. Thus, it is not necessary, or even desirable, for Barnes to subpoena and depose the attorneys and sitting judges in Monroe County.[10] Moreover, the results of the "opinion poll," embraced by the majority, could not reliably discern the truth or falsity of Horan's assertions regarding Monroe County's judges' and lawyers' opinions of Barnes as a lawyer and/or candidate. See, e.g., Ollman v. Evans, 750 F.2d 970, 1006 (D.C.Cir.1984) (a community's opinion of a plaintiff's stature in the community is incapable of being adjudicated with any expectation of accuracy). (Bork, J., concurring). Accordingly, I believe that such discovery is impermissible and should not be allowed to take place.
Thus, for these reasons, I concur in the reversal of the dismissal of this lawsuit.
NOTES
[1] An amended pleading that is complete in itself and that does not refer to or adopt a former pleading as a part of it supersedes the former pleading. See Dee v. Southern Brewing Co., 146 Fla. 588, 1 So.2d 562, 563 (1941)(By the filing of this declaration the plaintiff abandoned the original declaration and it no longer served any purpose in the record).
[2] As stated in Kelley v. Schmidt, 613 So.2d 918, 919 (Fla. 5th DCA 1993), the striking of a party's pleadings resulting in a dismissal or a default is the most severe sanction and it should be used "sparingly and reserved to those instances where the conduct is flagrant, willful or persistent."
[3] At one point in the record, counsel for Barnes asked for dismissal "in a way that all the issues go up on appeal." The court asked, "What would be necessary to do that?" Barnes responded "I think that dismissal with prejudice is all that is required." The court immediately thereafter observed: "I think you are entitled to a review, and know that you are all serious about it, and I guess it is a significant issue for the bar."
[4] It is undisputed that as a candidate for public office, Barnes is a public figure. Although Milkovich may be distinguished from the instant case in that Milkovich does not involve a plaintiff who qualifies as a public figure, the analysis contained therein concerning the differences between pure and mixed opinions is still relevant.
[5] Although the plaintiff dropped statements (b) and (c) from the second amended complaint, it is within the trial court's discretion to, upon request, grant the plaintiff leave to amend, so long as it finds that the defendants would not be prejudiced and that the privilege to amend has not been abused. Video Indep. Med. Examination, Inc. v. City of Weston, 792 So.2d 680, 681 (Fla. 4th DCA 2001); General Container Serv., Inc. v. William H. McGee & Co., 734 So.2d 570 (Fla. 3d DCA 1999).
[6] Mr. Horan has expressed concern that allowing the circuit court judges of Monroe County to be subpoenaed in this case would set a dangerous precedent for potential cases in other circuits in which the testimony of hundreds of sitting judges might be required. As the instant case involves only the relatively small pool of Monroe County judges, we need not address these logistical concerns at this time. Although we sympathize with the trial court's hesitance to take the unusual step of issuing subpoenas to sitting judges, sometimes the pursuit of justice requires that extraordinary measures be taken.
[7] In contrast, the plaintiff in Milkovich was a private high school wrestling coach and the defendant was a newspaper. Since the alleged defamatory statement was made by a media defendant and the case involved a matter of public concern, the court held that the plaintiff was required to show that the false connotations were made with some level of falsity as required by Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
[8] Hence, in the aftermath of Gertz, the Florida Supreme Court held that a private individual suing a newspaper for libel need only prove negligence rather than actual malice. See Miami Herald Publishing Co. v. Ane, 458 So.2d 239 (Fla.1984).
[9] See Hepps, 475 U.S. at 779 n. 4, 106 S.Ct. 1558.
[10] Nor may it even be possible for him to question the judges regarding Barnes' qualifications for public office as the code of judicial conduct prohibits the judges from responding to any such inquiries. See Fla.Code Jud. Conduct, Cannon 7A(1)(b).